Millard L. Midonick, J.
The motion by plaintiffs is hereby denied, and judgment on the verdict, as well as on inquest, is directed to be entered against the several defendants, as set forth below.
Plaintiffs at the end of trial moved under CPLB 4404 to set aside a verdict in the plaintiffs’ favor in the sum of $1,653.08. Since the motion is made “asa matter of law ”, it is understood that plaintiffs are requesting judgment be directed in their favor against defendant Lufthansa (herein sometimes called the airline or the carrier) in the sum of $9,605.68, or in the alternative that a new trial be ordered on the separable issue of the limitation of liability of said defendant, on the ground that the verdict limited to $1,653.08 is contrary to the weight of the evidence.
The defendant airline, Lufthansa, would have preferred a verdict exonerating it of any liability, but now seeks to confirm the verdict as rendered rather than to allow plaintiffs’ effort to recover what plaintiffs contend was the true value of the lost merchandise, $9,605.68.
Both parties involved in this motion have joined on common ground that-the figure of the unanimous verdict, $1,653.08, is a correct, in a mathematical sense only, conversion or counter-value into dollars of the United States of America, under the formula (based upon the weight of the lost shipment) of ceiling limitation adopted by the High Contracting Parties adhering to the Warsaw Convention of 12 October, 1929 (49 U. S. Stat. 3000 et seq.; English translation begins at p. 3014) limiting the liability of the carrier in ‘ ‘ international transportation of * * * goods performed by aircraft for hire but plaintiffs oppose and the airline supports the proposition that such treaty limitation of liability should apply to the 221 pounds of mink skins which plaintiffs’ testator attempted to ship by air freight from the City of New York to Frankfurt, Germany, via the defendant airline.
The goods were totally and forever lost on the same day of the commencement of shipment, March 1, 1962, by theft described as “ hijacking ” on the ground within the City of New *445 York, while en route between the plaintiffs’ testator’s place of business in New York County to Idlewild Airport (now known as John F. Kennedy International Airport), in Queens County.
The plaintiffs’ testator then operated a fur company which for years had been periodically exporting fur skins in the fashion and by the same means employed on this occasion. We shall call him the shipper and the defendant Lufthansa the carrier.
The shipper about midday on March 1, 1962, telephoned his usual freight forwarded whose name, such is the long arm of coincidence, was “ Furman ”, explaining the need for immediate air freight for the said shipment and stating the value of $9,605.68 for this shipment of mink skins.
The forwarder, having in his possession printed air waybills of the carrier, with authority to issue the same (quite similar to the well-known authority of bonded travel agents to issue valid air tickets to passengers), forthwith called the carrier and relayed all of the information, including the value stated, and was advised by the carrier that the shipment would be sent out aboard its aircraft scheduled for departure to Frankfurt about 2:00 a.m. on March 2, 1962, i.e., that very night. The carrier itself noted at that time on its [1] ‘ pick-up sheets ’ ’ dated March 1, 1962, that the shipper had two packages aggregating 221 pounds, destination Frankfurt, “ $9606.00 insurance ”, and under a column headed “Advised Cartage Agent,” the carrier inscribed the name of a trucking firm “ Heather ” which the carrier chose. The carrier forthwith telephoned said trucker, a defaulting defendant herein, orders to pick up the said shipment at shipper’s Manhattan place of business for delivery to carrier’s establishment and aircraft at Idlewild. The said trucking company was instructed by the carrier to insure for $9,606 the said furs during ground travel from shipper to carrier within New York City but the trucking company failed to do so. A default judgment in that amount of $9,606 against both defendant trucking companies was rendered, on inquest, but the defendant trucking companies appear to have abandoned their business and to have no assets or means to respond to this judgment.
Both the forwarder and the carrier had offices located at Idlewild Airport, and all telephone calls described above were received and made by them at that airport on March 1, 1962. As soon as those telephone calls had concluded, the forwarder drafted the carrier’s air waybill in a set containing many counterparts, sent one by messenger to the carrier in the same airport, and mailed another to the shipper.
*446 Instead of inserting on the face of the air waybill the value as stated by the shipper, and as contemporaneously noted by the forwarder and the carrier, the figure $9,606 nowhere appears on the air waybill. Instead, a limitation of value appears clearly on the face of the air waybill in the form of “ WCL ”, meaning “ Warsaw Convention Limitation ”. Both parties here contending, concede that the meaning of “ WCL ” as it would affect this shipment if legally applicable, is to limit value to $1,653.08, which figure the jury ultimately adopted as its verdict. The forwarder typed ‘ ‘ WCL ’ ’ clearly on the face of the air waybill in two places: in boxes under the printed headings “ Shipper’s declared Value for Customs ” and “ Shipper’s declared Value for Carriage ”. The carrier’s freight charge for air carriage is inserted as $98.35, but no figure was inserted beside the printed excess ‘ ‘ Valuation Charge ’ ’. The undisputed evidence was that, had $9,606 been inserted on the air waybill, an additional $4 for such “ Valuation Charge ” for excess valuation would have been added to the shipper’s expense owing to the carrier.
If the inserted limitation of valuation on the face of the air waybill is effective, no more than a value of $1,653.08 can be recovered by plaintiffs, as the jury found; if such air waybill limitation is not effective, a value of $9,605.68 is claimed by plaintiffs.
It was undisputed that this shipper had done similar business with this forwarder on numerous previous occasions, sometimes reaching 15 times per week during busy seasons, and that the air waybills were always drafted or filled out in this manner, i.e., using “ WCL ” and thereby obtaining the minimum freight rate due to Warsaw Convention Limitation in valuation.
At all material times, the United States of America and the destination country, West Germany, were High Contracting Parties adhering to this treaty known as the Warsaw Convention. At the time of ratification, the nation then known as “ Germany ” was the party.
At the time of trial, it was, and still is, a matter of vigorous disagreement between the parties whether loss of goods on the ground en route to the airport of departure is covered by the provisions of the Warsaw Convention. The shipper negates the applicability of this treaty because the carriage by air had not begun, although urging that the air carrier was liable vicariously for its agent, the ground truckman. The carrier sets up the treaty as a limiting factor because the air waybill had been issued for a carriage that by its terms was within the ambit of the treaty and the goods had begun their international *447 voyage, only to be diverted by a third force in the form of the abortive hijacking en route within the City of New York; the carrier further contends that by contract the parties incorporated an air carriage treaty limitation of liability even though by its own terms the treaty may not be applicable to pre-airport ground losses.
At the trial, the issue of whether the trucking company was the agent of the air carrier, for purposes of vicarious liability of the air carrier, placed the air carrier in an uncomfortable position. Attempting primarily to disassociate itself from the trucking company’s loss of the goods and thereby to win a complete verdict for the defendant air carrier on the ground that the air carrier had never received the goods (certainly not at the airport), the air carrier nevertheless urged that in any event it was not liable beyond the air treaty “ Warsaw Convention Limitation ’ ’, for a ground carriage loss! The air carrier’s concern with respect to vicarious responsibility was realized when the jury found in response to interrogatory put by the court, that “ the truckman [was] the agent of the defendant Lufthansa.” The fault of the agent truckman having been laid at the feet (or wheels) of the air carrier as principal, the air carrier insisted that its ground loss liability was limited by its contract to an air treaty limitation whether or not the truckman could claim protection of this contract.[1] **The air carrier does not now attack the jury’s findings on this issue, nor its verdict; the shipper cannot attack the jury’s findings on this issue for it would be entitled to no verdict at all unless the truckman was the agent of the air carrier. In any event, the mere fact that the shipper was obligated to reimburse the air carrier for the trucking charges does not negate the agency or the liability of the air carrier; by way of analogy, the air freight charges to be paid by the shipper would not have negated liability of the air carrier for an air loss.
The shipper contends that since the treaty cannot limit the recovery of the shipper, the only other defense open to the carrier, the aforesaid one of alleged contractual limitation, fails because “ WCL ” was not the agreement made by the shipper *448 and is therefore not a bar to proof of and recovery for full value. The shipper contends that the air waybill did not reach the shipper by mail before the loss which occurred on the very day of the shipment, and that even if the shipper was chargeable with knowledge of how the air waybill always read in his previous shipments, its very terms are not protective of carrier in limiting value below the actual and declared figure of $9,605.68.
I hold that the Warsaw Convention, operating as a treaty, does not limit the value of shipper’s recovery below its actual proved value, but that the contract made by the shipper does limit that value by his own voluntary agreement, by which he under standingly, freely, knowing that he had the alternative to pay additional excess valuation charges, and in order to save such additional charges, adopted and incorporated by reference the treaty formula as it applied to the weight of this shipment, to wit, valuation limitation of $1,653.08. This is in effect the basis for the unanimous verdict of the jury, and the basis for the pertinent interrogatories unanimously returned by the jury.
The motion to set aside the verdict is therefore denied, and judgment is ordered to be entered on the verdict in favor of plaintiffs against defendant Lufthansa airlines. Since by consent the two first-named defendants in the caption were one and the same, the judgment by its terms will apply to both in the amount found by the jury.
The treaty by its own terms (except as it is incorporated by express reference in the contract of the parties) cannot limit the carrier’s liability here. It provides in article 1, under “ Scope-Definitions ” that “ This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire.” [Italics supplied.] Article 6 requires that “ (1) The air waybill shall be made out by the consignor [shipper] in three original parts and be handed over with the goods. * * * (4) The signature of the carrier may be stamped; that of the consignor may be printed or stamped. [The forwarder stamped the carrier’s name by the forwarder as its “ agent the forwarder typed or stamped the shipper’s name, by itself as agent.] (5) If, at the request of the consignor, the carrier makes out the air waybill, he shall be deemed, subject to proof to the contrary, to have done so on behalf of the consignor.”
Article 18 of the treaty provides, under chapter III entitled “ Liability of the Carrier ”:
“ (1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any *449 checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.
“ (2) The transportation by air within the meaning of the preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft, or, in the case of a landing outside an airport, in any place whatsoever.
“ (3) The period of the transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport. If, however, such transportation takes place in the performance of a contract of transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air. ’ ’
The entire chapter IV entitled ‘ ‘ Provisions Relating to Combined Transportation ”, reads as article 31:
“ (1) In the case of combined transportation performed partly by air and partly by any other mode of transportation, the provisions of this convention shall apply only to the transportation by air, provided that the transportation by air falls within the terms of article 1.
“ (2) Nothing in this convention shall prevent the parties in the case of combined transportation from inserting in the document of air transportation conditions relating to other modes of transportation, provided that the provisions of this convention are observed as regards the transportation by air.”
As permitted in subdivision (2) of article 31 above, these parties did insert in the document of air carriage conditions relating to or including the ground transport en route to the airport, since the conditions covered the whole combined voyage or carriage, in the form of limitation of valuation to $1,653.08. This is what the jury found, and the evidence supported this finding and the verdict based upon it.
Subdivision (2) of article 22 of the treaty provides: “ In the transportation * * * of goods, the liability of the carrier is limited to a sum of 250 francs per kilogram [$1,653.08 as it applies to this shipment], unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires. [No such sum was paid, or entered on this air waybill, either this time or by previous practice of this shipper, and the oral declaration of *450 $9,605.68 was evidently for a different purpose such as (a) United States export information, (b) to assert that the actual value was at least as great as the Warsaw limitation of $1,653.08, and (c) by inference, to support possible claims against shipper’s own insurer if any.] In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless he proves that that sum is greater than the actual value to the consignor at delivery.”
Common-law rules of liability under the law of New York impose a higher standard of care upon a carrier than the treaty standard. Both the common law and the treaty nullify exculpatory contract clauses “tending to relieve the carrier of liability”.
Article 23 of the treaty provides: 1 ‘ Any provision tending to relieve the carrier of liability or to fix a lower limit[2] than that which is laid down in this convention shall be null and void, but the nullity of any such provision shall not involve the nullity of the whole contract, which shall remain subject to the provisions of this convention.”
Under the Warsaw Convention subdivision (1) of article 20: “ The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures. ’ ’
By contrast the common-law standard is defined as follows:
‘ ‘ At common law the liability of the common carrier is often described as that of an insurer of the goods carried, and his defences are limited to act of G-od or of the King’s Enemies [enemies of the People of the State of New York or of the United States do not include, for this discussion, hijackers or other felons whose conduct falls short of treasonous insurrection], inherent vice of the goods, or negligence of the shipper.” (Drion, Limitation of Liabilities in International Air Law [1954], p. 31; accord: Gardiner v. N. Y. Cent. & Hudson Riv. R. R. Co., 139 App. Div. 17, affd. 201 N. Y. 387; Scire v. American Export Lines, 197 Misc. 422; David v. Abramowitz, 143 Misc. 162; Perkel v. Pennsylvania Ry. Co., 148 Misc. 284.)
Having in mind the conflict between these parties as to whether the higher standard of care expected of surface carriers on the one hand, or the somewhat lower standard of care imposed on international air carriers on the other, would here properly *451 apply, the court put to the jury the interrogatory embodying the lower standard of care required of the carrier by air. Even this lower standard the jury found this carrier to have failed to meet, as indicated in interrogatory No. 9. A fortiori, the carrier was liable under New York local law.
However, the parties were free to limit the measure of damages by express contract to $1,653.08, and this jury found that they did, both by the general verdict and by the written answers to the nine interrogatories required by the court pursuant to CPLR4111 (subd. [c]).
The general verdict for shipper against this carrier in the sum of $1,653.08, with interest from March 1, 1962, was preceded by the following nine answers to interrogatories, all unanimous:
“ Interrogatory No. 1: Was Ira Furman Company [the forwarder] the actual agent of defendant Lufthansa in the preparation and issuance of the air waybill, Plaintiff's Exhibit 1? Answer ‘yes' or ‘no’. Yes
“Interrogatory No. 2: Was Ira Furman Company clothed by defendant Lufthansa with apparent authority to act as its agent in the preparation and issuance of the air waybill, Plaintiff’s Exhibit 1? Answer ‘yes’ or ‘no’. Yes
“ Interrogatory No. 3: Was the shipment in question, in fact, picked up on March 1, 1962 from plaintiff’s place of business by a truckman so requested by defendant Lufthansa? Answer 1 yes ’ or ‘no ’. Yes
“Interrogatory No. 4: If question 3 is answered ‘yes’, was the truckman the agent of the defendant Lufthansa? Answer ‘yes’ or ‘no’. Yes
“ Interrogatory No. 5: Was the fair market value of the shipment in question at least $9,605.68 on March 1, 1962? Answer ‘yes’ or ‘no’. No
“ Interrogatory No. 6: Should it have been the reasonable understanding of Ira Furman Company on March 1, 1962, on the basis of its conversation with plaintiff, that the notation ‘WCL’ (Warsaw Convention Limitation, meaning in this ease $1,653.08), was intended by plaintiff to be inserted on the air waybill of defendant Lufthansa? Answer ‘ yes ’ or ‘ no ’. Yes
“ Interrogatory No. 7: Should it have been the reasonable understanding of Ira Furman Company on March 1, 1962, on the basis of its conversation with plaintiff, that $9,605.68, as per Plaintiff’s Exhibit 2, was intended by plaintiff to be inserted as valuation on the air waybill of defendant Lufthansa? Answer ‘ yes ’ or ‘ no ’. No
“ Interrogatory No. 8: Did the plaintiff have any notice of the actual terms of the air waybill, Plaintiff’s 1, before this shipment was lost? Answer ‘yes’ or ‘no’. Yes”.
It is a tribute to the intelligence, care and discernment of this jury that during its deliberations it requested repetition of the court’s instructions concerning foreknowledge by plaintiff of what the waybill would contain on the basis of the course of dealing theretofore practiced. The jury’s question: “ Please repeat the charge with reference to the term ‘ Notice ’. What criteria can we use (other than actual delivery by mail of the waybill to Hecht Pick) in determining whether or not Heclrt *452 Pick had received notice of the contents of .the air waybill? For example, telephone confirmation? Foreknowledge of what the waybill would contain? ”
“ Interrogatory No. 9: Did the carrier Lufthansa and its agent, if any, take all necessary measures to avoid the loss, or, if not, was it impossible for it or them to take such measures? Answer 'Yes’ or 'no’. No”.
The court does agree with plaintiffs to the extent that the finding of the jury in answer to Interrogatory No. 5 is against the weight of the evidence. The only evidence, and it was clear, expert and credible, proved that the fair market value of this shipment was indeed $9,605.68, and also that the shipper, immediately before shipment, had bid and paid that price at public auction in the open professional market for furs here in issue. But this erroneous finding of the jury became moot when it rendered its further finding in response to Interrogatory No. 8, that plaintiff had notice of the actual terms of the air waybill, plaintiff’s Exhibit “ 1 ”, before this shipment was lost. Indeed, this is tantamount, in view of the evidence, to a finding that the shipper agreed to the contract of carriage in the form of the air waybill as written, and the general verdict also supports this finding, and the court concurs in it. That waybill, like the many before it, invariably limited value to the Warsaw Convention formula, so that the jury need only have found, as it did, that the value of the furs shipped was at least as much as that formula, in order to support the general verdict in that amount of $1,653.08. In view of all of the other answers, findings and the general verdict, and despite answer No. 5, all of which were consistent, the erroneous answer to No. 5 was both moot and immaterial. Whether or not the jury had answered No. 5 differently, in the affirmative, that the fair market value of the shipment in question was at least $9,605.68, and if it had adhered to all of its other answers as made, the general verdict would have been consistent with the answers to the interrogatories, irrespective of how Interrogatory No, 5 was answered. Indeed, the court could have eliminated the fifth interrogatory by prefacing it with the condition that it should be answered only if the eighth interrogatory were answered in the negative. Having answered the eighth in the affirmative, the jury made answer to the fifth by way of mere surplusage.
This discussion about this fifth interrogatory, particularly as to the actual value of the shipment, is not necessary to this decision but is given in fairness to the plaintiffs, in order to avoid the need in any event of a new trial on that problem alone.
All other motions to set aside the answers of the jury to any *453 interrogatories as against the weight of the evidence, except as to Interrogatory No. 5, are denied.
There is also the problem of whether the common-law agreement found here, limiting liability, made by the shipper and. carrier, was unenforcible because of violation of Federal law. This problem enters this case because of the holding herein that the Warsaw Convention does not apply to ground transportation and therefore does not pre-empt the field from Federal regulation. This decision on this point will have a wider application as soon as the 15th of November, 1965 official denunciation of the Warsaw Convention by the United States terminates the operation of the Warsaw Convention even with respect to international air carriage. This denunciation by the United States will take effect six months after the 15th of November, 1965. Thereafter, United States laws will control interstate and international air carriage in all cases when the law of the United States and its political subdivisions applies.
Thereafter, both ground and air carriage across State lines (now, because of the treaty, only ground carriage) will be controlled by the Civil Aeronautics Act and by many decided cases both New York and Federal which have been held to limit the freedom of the shipper and carrier to limit the value of goods for purposes of liability.
In this very case, shipper and carrier would be by law restricted in the contract of carriage by published tariff rates filed by the carrier, if such published tariff rates were in conflict with their contract of carriage. Thus the Court of Appeals has recently held that, if an air carrier (or ground carrier) files tariffs requiring itself to charge for and be responsible for actual value, it cannot limit value by contract (New York & Honduras Rosario Min. Co. v. Riddle Airlines, 3 A D 2d 457, 460, affd. 4 N Y 2d 755, 756; Grace & Co. v. Railway Express Agency, 8 N Y 2d 103, 105; U. S. Code, tit. 49, §§ 1372, 1373 [Federal Aviation Act of 1958]). But the same cases indicate that if filed tariffs provide and if, as Lufthansa’s air waybill so clearly gave to the shipper, a “ choice of rates dependent on value,” the Court of Appeals and the Civil Aeronautics Act support the effectuation of limitation of valuation. Only when the air carrier’s filed rates require itself to charge for actual value declared ‘ ‘ without any choice of rates dependent on value,” can the shipper recover actual value above the contracted-for limitation of value. '
The plaintiff shipper here neither urged nor proved that Lufthansa’s filed tariffs prohibited the choice of limitation of value, so we must assume and find that the actual parties ’ choice *454 of lower rates and avoidance of the proved extra rate for excess “ Valuation Charge ” was not in conflict with filed tariff rates. The above-cited cases are therefore clearly distinguishable, and the contract of the parties binds the plaintiff shipper.
"While the holding here made is based upon a common-law limitation of liability by limitation of value due to voluntary agreement of the shipper and the carrier in a surface transport situation, since this court is not infallible, we proceed to observe, contrary to the holding herein, that it is quite possible that another theory of law would also support the result and the verdict here, quite independently. Such a theory would apply the Warsaw Treaty in whole or in part, on the basis of an interpretation of the treaty provisions different from that which its terms appear at first blush to mandate.
The author Drion suggests much the same approach in “ Limitation of Liabilities in International Air Law ” (1954). Thus, even where article 18 is not satisfied, Drion suggests, presumably because air carriage is not the cause of the damage, if nevertheless an air carrier has accepted the goods under an air waybill, the liability may nevertheless be limited by article 22 as the jury did here. In the work above cited, at page 70, Drion states: ‘ ‘ For the most frequent cases in which such liabilities arise, Articles 17 to 21 establish a system of liability. In the cases not covered by these Articles [perhaps ground transport town to airport, as here], in which the carrier would nonetheless have fallen short of his obligations as to safety or preservation, his liability will be governed by national law [virtually as insurer in New York], but will be limited by Article 22 [here $1,653.08].”
A purely grammatical interpretation of the Convention is not recommended by the author, because “this would be overestimating the logical consistency of an international Convention such as the Warsaw Convention with a drafting history of almost five years.”
Again, Drion has great difficulty in applying article 31 literally. In the work cited above, at pages 83 to 87, he carefully emphasizes that the carriage by air may encompass the entire “period” from shipper’s portal or possession to consignee’s portal or possession, as long as carriage by air is centrally involved. This may be correct, he reasons, because the original French of the treaty (art. 36) uses the word “ dans ”, meaning in, the carriage by air, rather than the word “ pendant ”, meaning during the carriage by air, in article 19 affecting damages by delay. True, the word “during” is used in article 18 covering damage (i.e., injury) or loss, as contrasted with delay, but one can question if the intention of the High Contracting *455 Nations was essentially different. “ [D]elay in delivery service to the town ” may thus be delay in a carriage by air (p. 86). Further, on pages 86-87, the entire argument as to delay might well apply to the loss here involved.
‘ ‘ How about delays in the air carriage caused by delays in the ground transportation from the town to the airport of departure? It is believed that Article 31, dealing with [1] combined carriage ’, does not apply to these situations. The combined carriage governed by this Article was certainly not meant to include the cases of ground transportation purely incidental to the carriage by air, the kind of ground transportation envisaged by Article 18 (3) being ‘ for the purpose of loading, delivery or trans-shipment ’. It may not always be easy to draw the line where surface transport incidental to air carriage ends, and genuine ‘ combined carriage ’ starts. Generally the concept of combined carriage should not be construed in a restrictive way. The fact that the ground transportation is performed by the air carrier may be an indication that the parties considered it as something incidental to the air transportation, but is by itself not sufficient to take the carriage out of the sphere of Article 31.
“ To say that Article 31 does not apply to town-airport transportation does not mean that the carrier will be liable for delay in such transportation as if it were carriage by air, but only that if such delay were to result in a delay in the carriage by air, the latter delay would be governed by Article 19, whereas Article 31 seems to imply that in case of combined carriage, any delays occurring in the other parts of the transportation, even if they necessarily were to result in a delay in the air carriage, would not be governed by the Convention. Where a delay in the carriage by air is caused by a delay in accessory ground transportation, the carrier will have to prove that he and his agents had taken all necessary measures to prevent the delay in the air carriage or that it was impossible for him and them to do so (Article 20). If there had been negligence in the delay of the ground transportation, the case would turn upon the question of whether the ground transportation was performed by agents of the carrier. In such an event the carrier would fail in his defense under Article 20. The carrier’s liability would, of course, be limited by Article 22 of the Convention. ’ ’
The Clerk is therefore instructed to enter judgment for the plaintiffs against the defendant Lufthansa German Airlines and Deutsche Lufthansa Aktiengesellschaft (the said first two named defendants being the same company) in the sum of $1,653.08, with interest from March 1, 1962, and with costs and disburse *456 ments. On default and on inquest, there having been no contractual limitation of value as between plaintiffs and the last two named defendants, judgment against them shall be entered in the full sum of $9,605.68, with interest from March 1, 1962, and with costs and disbursements.

. The truckmen have no agreement with the shipper, certainly no agreement limiting their liability. The finding of the jury that “the truckman [was] the agent of the defendant Lufthansa ” does not clothe the remaining defaulting defendants who are ground carriers with any Warsaw Convention Limitation protection. Thus it is stated by Kreindler, “ Interim Report on the Warsaw Convention ” (Trial Lawyers 2., N. Y. State Assn. of Trial Lawyers, Summer ed. 1965, 69, 71-72): “ The second major loophole in the Warsaw Convention * * 4 is its failure to limit the liability of servants and agents of the airline,”

. On 15 November, 1965, the United States delivered its official denunciation of the entire Warsaw Convention, the legal effect of which is to terminate the operation of the treaty six months after date of denunciation in all eases where the law of the United States and its political subdivisions applies.