■ BROOKLYN OVERALL EXPORT COMPANY LTD. et al., Respondents, v AMERFORD INTERNATIONAL CORPORATION, Appellant. — In an action to recover damages for breach of contract, defendant appeals, as limited by its brief, from so much of a judgment of the Supreme Court, Queens County (Calabretta, J.), entered April 7, 1980, as, after a nonjury trial, awarded plaintiffs the principal sum of $34,500, on two causes of action. Judgment affirmed insofar as appealed from, with costs. The record shows that defendant breached an oral agreement with plaintiffs to structure a business transaction that involved shipping plaintiffs' goods to a buyer in Sweden and arranging for payment. Plaintiffs' employee, Jeffrey Boshnack, testified that he informed defendant's customer service agent, Ruth Witz, that he had 52 cartons of jeans to be shipped to a Stockholm buyer from his companies' Texas factory and Long Island warehouse. He said he informed her specifically that the goods were not to be handed over to this buyer except on payment. With this arrangement, he testified, he believed he had no need to investigate the credit rating of the buyer, a new customer; such was the normal procedure for his employer. Pursuant to Witz' request, he sent her written instructions for each shipment point; the Long Island instruction was to "ship * * * against sight draft," and the Texas instruction was to "ship * * * to [buyer] * * * Ship freight collect — customer must pay on sight draft." Boshnack said he relied on defendant to prepare the paperwork necessary to carry out his intent, and assumed everything was in order and the goods were paid for on his receipt of a copy of the papers after air shipment of the goods. Boshnack admitted being unfamiliar with shipping customs. His prior experience involved shipping goods for cash in advance, cash on delivery or on letters of credit, and his understanding of those terms was limited to domestic usage. In this instance, he said, he used the term "sight draft," which he had picked up from a forwarder, even though prior shipments through defendant had been for cash on delivery terms and he was not sure what the term meant. Mrs. Witz testified that she would have insisted on using a cash on delivery term had she been told by Boshnack that he wanted assurance of payment on delivery. What Boshnack emphasized, she said, was the need for speed. After she filled in a shipper's letter of instruction form to specify drawing drafts at sight, defendant's banking department prepared certain documents. The draft for each of the two consignments

specified that a Stockholm bank, acting as defendant's agent, should deliver the documents against payment. Mrs. Witz acknowledged the fact that this meant the documents would not be released to the buyer absent payment. But she admitted that the buyer could obtain the goods on arrival in Sweden without payment because the air waybills listed the buyer as consignee instead of the correspondent bank (thus obviating the buyer's need for any documents). She blamed plaintiffs' instructions that, she said, told her to consign the goods directly to the buyer without any intermediate consignee who would hold the goods pending payment. Had plaintiffs told her they wanted the drafts paid on delivery, she would have listed the correspondent bank as consignee on the waybill so that buyer would have had to obtain the documents from the bank before presenting them to the carrier for delivery of the goods. Trial Term found that Mrs. Witz clearly understood what Boshnack had intended, and held defendant liable for delivery of the goods to the buyer without payment. We agree. Plaintiffs' intention, as expressed to defendant, was to retain control over the goods pending payment, and to rely on defendant's skill in using a sight draft rather than a cash on delivery term. Defendant could have met the obligation by arranging a documentary sale in which the air waybills were negotiable instruments of title entrusted to its banking agent in Stockholm pending buyer's honoring of the sight draft by payment, or by restricting straight (i.e., nonnegotiable) waybills in such a manner that the carrier would not hand over the goods to the buyer absent instructions from defendant's agent, secured after payment. (See *Dusal Chem. Co. v Southern Pacific Co.*, 102 Misc 222; see, also, *Christoffersen v Murray Packing Co.*, 24 AD2d 587, affd 17 NY2d 855; *Gubelman v Panama R.R. Co.*, 192 App Div 165, 169; US Code, tit 49, §§ 82, 83, 88, 89, 112; Uniform Commercial Code, §§ 7-104, 7-303, 7-403, 7-504; Warsaw Convention, 49 Stat 3000; US Code, tit 49, § 1502, n, arts 11, 12, 13.) Mrs. Witz' insistence at trial that Boshnack specified speed rather than security is belied by the basic incompatibility of straight waybills directly consigning goods to the buyer, with sight drafts prepared for a documentary sale. (See *Dusal Chem. Co. v Southern Pacific Co., supra*, pp 224-225.) Even if Boshnack is to be faulted, as the dissent suggests, for his ignorance of the term "sight draft," nevertheless defendant should be held accountable for the negligent exercise of its relied-on expertise in carrying out the parties' understanding. Defendant also argues that its tariff filed with the Civil Aeronautics Board should apply in limiting the value of the goods delivered to the buyer and, therefore, the amount of plaintiffs' loss. Defendant, however, acted not only as plaintiffs' agent in being an intermediate carrier of the goods from the factory and warehouse to the airports involved, but also in establishing the form for this transaction, which involved both carriage and collection. Part of its duty in this latter regard was deciding whether to make an excess valuation declaration, and there is no evidence indicating that this was not one of the several decisions necessary to the transaction that had been entrusted by plaintiffs to defendant's discretion. Defendant's further argument that the Warsaw Convention's limitation of liability is applicable to this shipment must likewise be rejected. The breach resulting in plaintiffs' injury arose in the preparation of documents prior to defendant's acceptance of the goods as a forwarder and indirect carrier (see *Orlove v Philippine Air Lines*, 257 F2d 384, 387; *N.V. Organon [Oss] v Coop Ver. Nederlandse Luchtvracht Groupage Centrum [NLC]*, 3 Hill & Evans Tr L of World 877 [Trib Haarlem, 1971]; but see *Pick v Lufthansa German Airlines*, 48 Misc 2d 442, 454-455; *Crosby & Co. v Compagnie Nationale Air France*, 76 Misc 2d 990, 997-998). We therefore conclude that defendant was properly held liable for its breach of the agency agreement with plaintiffs (see *Bostwick v*

*Baltimore & Ohio R.R. Co.*, 45 NY 712; *Dana v New York, Cent., & Hudson Riv. R.R. Co.*, 50 How Prac 428). Hopkins, J.P., Lazer and Gibbons, JJ., concur.

Cohalan, J., dissents and votes to reverse the judgment insofar as appealed from and dismiss the complaint, with the following memorandum: This entire brouhaha was precipitated by and through the *ignorance* of an employee of the plaintiff corporations who pretended to a knowledge of commercial trade parlance that he did not have. The irony of the situation lies in the circumstance that his ignorance redounded to the benefit of his employers and to the consequent entry of a money judgment against the defendant. Pope's remark that "a little learning is a dangerous thing" bore bitter fruit in this case. Jeffrey Boshnack, a four-year employee in 1978 and secretary-treasurer of the two corporate plaintiffs at the time of the trial in 1980, was called to testify with respect to a transaction had in May of 1978 with a customer in Stockholm, Sweden (Design Nobless). Plaintiffs had arranged, as manufacturers, to sell three thousand odd pairs of overalls to the Swedish firm and planned to use the services of defendant as a freight forwarder for shipment of the goods to Sweden. Boshnack had dealt with Amerford before on four or five occasions, all on a "C.O.D." basis. The Swedish buyer was in a hurry to obtain the goods, which fact Boshnack imparted to the Amerford employee in a telephone call. He told Mrs. Witz, the employee, the sale would be lost unless swiftly consummated. At the request of Mrs. Witz, Boshnack put in writing the terms of his orders, two in number. The first one read: "Subject: Design Nobless, Stockholm, Sweden Date 5/22/78 Message: Please ship 5 cartons against *sight draft*[1] for $2,900.00. *** Ship as soon as possible. Thank you Jeff Boshnack." The second provided: "Subject: Design-Nobless, Date 5/22/78 Message: Please ship 47 cartons to Design Nobless, Box 7115, 10383, Stockholm, Sweden. Ship freight collect — customer must pay on *sight draft* $31,600.00 Thank you Jeff Boshnack." The upshot was that the goods were delivered. The Swedish company filed in bankruptcy and the plaintiffs never received the sale price or the return of the merchandise. The ignorance displayed by Boshnack concerned the expression *"sight draft"*. In a colloquy instituted by the court, Boshnack was questioned: "Q In your discussions with Mrs. Witz, were the words, *sight draft* or accepted *sight draft* or consignee ever used? A Well, the word *sight draft* was used. Q All right, could you tell me, the Court, the substance of the conversation as it related to *sight draft?* A Well, I just — Q As best you can recall. A What I can recall is that I mentioned the terminology *sight draft.* Q You mentioned it first. Prior to your conversation with Mrs. Witz, did you have any familiarity with the words *sight draft?* Had you ever heard of those words? A I heard the words, I don't know clearly what they mean. I was — [2] *** Q Well, what method was used on the prior shipments, overseas shipments with Amerford? A I believe that they were all C.O.D. shipments, cash on delivery. *** Q And, why not — didn't you suggest C.O.D. on this shipment? A I don't know, just some term that was — somebody mentioned to me whether it was Amerford or some other freight forwarder, I don't know. *** Q You didn't suggest to her on this occasion to send it C.O.D. then? A I didn't use the terminology C.O.D. I just said — ". From this colloquy, two obvious inferences may be drawn: (1) Boshnack did not know what a *sight draft* was but, (2) he equated *sight draft* with C.O.D. Here, since Boshnack

---

**1.** The italics throughout this memorandum of the words sight draft is for added emphasis.

**2.** Boshnack's testimony was given in February of 1980. The transaction was on May 22, 1978. In the intervening 21 months, he had made no effort to ascertain the meaning of sight draft.

created the resulting confusion by his ill-conceived instructions, his actions should militate against his employers, under the theory, as in a contract interpretation, that if there is any ambiguity or misunderstanding, the words should be read against the preparer of the instrument *(Moran v Standard Oil Co., 211 NY 187, 196)*. Other items are worthy of mention: If Mrs. Witz had forwarded the goods C.O.D. it would have cost the plaintiffs a greater premium or collection fee. Also, it would have taken several days longer to make the delivery since it would have had to go through a Swedish bank and time in this instance was of the essence. Further, even though plaintiffs were engaged in a $34,500 transaction, they never ran a credit check on Design Nobless, with whom they had had no prior business dealings. As Mrs. Witz explained, the term "sight draft" has a definite meaning. Under direct questioning by defense counsel at the trial, the following occurred: "Q In the normal course of freight forwarding, if somebody gives you an instruction and says, 'Please ship five cartons against sight draft for $2,900,' what does that mean to a freight forwarder and to you particularly? THE COURT: What's the question? Q What does *[sic]* the words 'please ship' — A 'Please ship five cartons against sight draft for $2,900. Ship freight paid by Design Nobless. Ship as soon as possible.' * * * [Q] What does that mean in the trade? THE WITNESS: In the trade it means to ship the freight to the consignee. THE COURT: Directly? THE WITNESS: Directly, and draw a draft." The Dun and Bradstreet, 1981 Exporters Encyclopedia (§ III, p 3.3), contains a description of a "sight draft". It is: "A draft so drawn as to be payable on presentation to the drawee or within a brief period thereafter known as days of grace." A further explanation is found in Lowenfeld, International Private Trade (§ 5.21): "A bill of exhange [draft] can best be understood by comparing it to a simple check. Indeed a check is a bill of exchange drawn on a bank. But whereas in the ordinary check the payor (buyer) is the maker, his bank is the drawee, and the seller or creditor is the payee, the bill of exchange used in international transactions generally is drawn by seller (maker) as well as to the order of seller. In other words, the seller, who makes up the invoice, also makes up the negotiable instrument that will be used for payment. The buyer is the drawee, and in order to obtain the other documents he must act as a bank does in the ordinary checking situation: he must honor the draft — by immediate payment if it is a sight draft, or by 'accepting' it if it is a time draft." On cross-examination trial counsel for plaintiffs spoke of "an accepted sight draft". As noted, in Lowenfeld "sight draft" refers to immediate payment, whereas "accepted sight draft" relates to a "time draft". Immediacy was the order of the day in this case, so that there was no obligation on defendant's part to obtain Design Nobless' signature for a deferred payment. In any case, whatever delivery was effected short of a C.O.D. — which was not ordered — would have met with failure so far as payment was concerned, for Design Nobless was already insolvent. A perusal of the record reveals that the plaintiffs sellers exhibited a slipshod and careless attitude throughout the entire transaction, despite which they are being permitted to profit by their own mistakes. I would reverse the judgment insofar as appealed from and dismiss the complaint, with costs; and would relegate the plaintiffs to seek relief as general creditors in the bankruptcy court in Sweden.